Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KELLY ISBELL and HALEY HENDERSON, on their own behalf and on behalf of all others similarly situated,

Plaintiffs,

v.

BEBE STORES, INC.,

Defendant.

No. 2:25-cv-02388-BJR

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

## INTRODUCTION

Washington law ensures that deceit is never fashionable when it comes to marketing emails. The State's Commercial Electronic Mail Act ("CEMA") and Consumer Protection Act ("CPA") prohibit commercial emails containing "false or misleading information in the subject line." Wash. Rev. Code § 19.190.020(1)(b); *see Id.* § 19.190.030(1)(b) (CEMA violations are CPA violations). Despite the law's clear prohibition—and a recent Washington Supreme Court decision confirming the illegality of misleading information in email subject lines, *see Brown v. Old Navy, LLC*, 567 P.3d 38 (Wash. 2025)—Defendant Bebe Stores, Inc., ("Bebe") an apparel retailer, chose to engage in the exact activity which Washington law prohibits. With its deceptive scheme now laid bare, Bebe moves the Court for dismissal. Defendant's Motion to Dismiss, Dkt. 20 ("Mot."). First, it offers a preemption argument which misapplies the leading decision in *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040 (9th Cir. 2009), as this Court recently discussed in *Ma v. Nike, Inc.*, No. C25-1235JLR, __ F. Supp. 3d __, 2026 WL 100731 (W.D. Wash. Jan. 14, 2026). Its

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 1

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

second ground is a constitutional argument which fails to satisfy the governing standard for application of the Dormant Commerce Clause. Accordingly, Plaintiffs respectfully submit this response in opposition and ask the Court to deny Bebe's Motion to Dismiss.

## BACKGROUND

The use of subject lines containing false and misleading information is no new trend for Bebe. It relentlessly spams consumers' inboxes with email subject lines that herald the beginning, middle, and merciful end of promotions—*falsely*. Dkt.1–1, ¶¶ 40–98 ("Compl."). Often dressed in all caps, accented with emoji, and dripping with deception, Bebe's subject lines attract consumers' attention with urgent warnings and impending deadlines. Unfortunately for consumers, Bebe's subject lines reflect a marketing strategy premised on misrepresentation, rather than accurate information upon which they may rely to make informed buying decisions.

"Ends Tonight," "Ends Tomorrow," "Last Day," and "Until Midnight." As used in the subject lines of Bebe's marketing emails, these terms clearly communicated an important—indeed, *material*—fact to consumers: the end of a sale or promotion. They were also, each of them, false. Compl. at ¶¶ 59, 62-63. Instead of following the terms explicitly stated in their subject lines, Bebe extended each promotion beyond the advertised deadline. *Id.* This misleading marketing strategy allows Bebe to maximize sales during both the initial promotion and the subsequent extension.

Feigned mistakes, false deadlines, repeat warnings. When used to trick consumers, these marketing tactics are known as false limited time messages, false time scarcity claims, or false urgency claims, *id.* ¶¶ 29–33, and are a "common way online marketers manipulate consumer choice by inducing false beliefs." *Id.* ¶ 29. Marketers use them because they *work*. *See id.* ¶¶ 29-38. As deployed by Bebe, these tactics are straightforward violations of CEMA and the CPA.

## STANDARD OF DECISION

When challenged on a Rule 12(b)(6) motion, a complaint's factual allegations are taken as true, and "construed in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The motion must be denied if the complaint states a claim to relief that is "plausible on its face." *Littlejohn v. Kaiser Fdn. Health*

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 2

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

*Plan of Wash.*, 2024 WL 4451955, at *3 (W.D. Wash. Oct. 9, 2024). Where, as here, defendant seeks Rule 12(b)(6) dismissal based on an affirmative defense, it must show that the "allegations in the complaint suffice to establish the defense" and the defense is "apparent from the face" of the complaint. *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) (quotations omitted).

## ARGUMENT

### I. Plaintiffs' CEMA Claims Are Not Preempted by CAN-SPAM.

#### A. Plaintiffs' Claims Survive Preemption Because CEMA Prohibits the Very Deception that Congress Explicitly Excepted from CAN-SPAM's Reach.

CEMA is not preempted by the federal CAN-SPAM Act, 15 U.S.C. §§ 7701–7713 ("Act"). The Act's plain text, its legislative history, the Ninth Circuit's decision in *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040 (9th Cir. 2009), and cases decided before and after *Gordon* compel this conclusion. The Court need look no further than the plain text:

> This chapter supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, *except to the extent that any such statute, regulation, or rule prohibits falsity* **or** *deception in any portion of a commercial electronic mail message or information attached thereto*.

15 U.S.C. § 7707(b)(1) (emphases added). So, CAN-SPAM preempts any statute regulating the use of e-mail to send commercial messages unless the statute "prohibits falsity or deception" in commercial emails. *Nike,* 2026 WL 100731, at *2. The application of this plain text to CEMA is straightforward. CEMA prohibits sending commercial email that "[c]ontains false or misleading information in the subject line." RCW § 19.190.020(1)(b). By prohibiting "false or misleading" subject lines in commercial emails, *id.*, CEMA "prohibits falsity or deception" in some part of or information attached to commercial emails. 15 U.S.C. § 7707(b)(1). By its plain terms, then, the Act does not preempt Plaintiffs' CEMA claims.

The legislative history is similarly clear. The Report of the Senate Committee on

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 3

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

Commerce, Science, and Transportation described the effect of the Act's preemption as follows: "[A] State law requiring some or all commercial e-mail to carry specific types of labels, or to follow a certain format or contain specified content, would be preempted. By contrast, *a State law prohibiting fraudulent or deceptive headers, subject lines, or content in commercial e-mail would not be preempted*." S. Rep. No. 108-102, at 21 (emphasis added). The Senate Report confirms that Congress did not intend § 7707(b)(1) preemption to reach everything short of common law fraud, and indeed expressly endorses the very claims brought here: claims based on "a State law prohibiting … deceptive … subject lines … in commercial email" *Id.*

Court after court, before and after the Ninth Circuit's decision in *Gordon*, have concluded that statutory and common law claims which attack "falsity and deception" (§ 7707(b)(1)) broadly in commercial email are not preempted.[1] Attention to *Gordon*'s actual reasoning and holding, rather than loose citation to its dicta, reveals why. The question was "[w]hether the exception language of § 7707(b) permits states to prohibit e-mail activity that is *not* unfair or deceptive." 575 F.3d at 1062 n. 21. Unsurprisingly, the answer was no. *Gordon* involved CEMA's "point of origin" provision, which prohibits "misrepresent[ing] or obscur[ing] any information in identifying the point of origin or the transmission path" of commercial email. RCW § 19.190.020(1)(a); *see Gordon*, 575 F.3d at 1058. As construed by the court, CEMA's point-of-

---

[1] *See, e.g.*, *Asis Internet Servs. v. Subscriberbase Inc.*, No. 09-3503 SC, 2009 WL 4723338, at *3-*4 (N.D. Cal. Dec. 4, 2009); *Asis Internet Servs. v. Vistaprint USA, Inc.*, 617 F. Supp. 2d 989, 993 (N.D. Cal. 2009); *Asis Internet Servs. v. Consumerbargaingiveaways, LLC*, 622 F. Supp. 2d 935, 944 (N.D. Cal. 2009); *Smith v. Anastasia Inc.*, 2014 WL 12577598, at *2–3 (S.D. Cal. Sept. 15, 2014); *Wagner v. Spire Vision*, 2014 WL 889483, at *3–4 (N.D. Cal. Mar. 3, 2014); *Balsam v. Trancos, Inc.*, 138 Cal. Rptr. 3d 108, 122 (Cal. Ct. App. 2012); *Hypertouch, Inc. v. ValueClick, Inc.*, 123 Cal. Rptr. 3d 8, 27 (Cal. Ct. App. 2011), Indeed, one district court *reversed* its prior decision in light of *Gordon*. *Hoang v. Reunion.com, Inc.*, No. C-08-3518 MMC, 2010 WL 1340535, at *4 (N.D. Cal. Mar. 31, 2010) (vacating pre-*Gordon* decision) (plaintiff "not required" to "additionally allege he relied to his detriment" on false or misleading statement to avoid preemption.).

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 4

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

origin provision reaches "a vast array of nondeceptive acts and practices," including "unintentional clerical errors, imperfect representations, or immaterial misstatements." *Id.* at 1059 (quotations and citation omitted). The CAN-SPAM Act, by contrast, as interpreted in light of its text, structure, and purpose, *see id.* at 1061, does not authorize liability for "bare immaterial error," *id.* (quoting *Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 359 (4th Cir. 2006)), or "immaterial inaccuracies or omissions." *Id.* at 1062.

## B. Plaintiffs are Not Required to Plead Traditional Tort Theories to Avoid Preemption.

Dissatisfied with the statute Congress enacted, Bebe seemingly invites this Court to rewrite it. Bebe wrongly asserts that Congress's use of the words "falsity or deception" created an implicit requirement that state laws be based upon traditional tort theories to avoid preemption. However, Congress is presumed to choose its words carefully and courts are bound to apply them. *See Avendano-Ramirez v. Ashcroft*, 365 F.3d 813, 818 (9th Cir. 2004) ("[W]e must presume that Congress said what it meant and meant what it said."). The terms, "falsity" and "deception" do not equate "to common law fraud and Congress would have explicitly used the language of fraud in the CAN-SPAM Act if it intended to limit the exception to fraud alone." *Nike,* 2026 WL 100731, at *3; *see Consumerbargaingiveaways*, 622 F.Supp. 2d at 942 ("Congress … is certainly familiar with the word 'fraud' and chose not to use it; the words 'falsity or deception' suggest broader application. In fact, … Congress utilized the word 'fraud' in the very next subsection."). Congress made a clear choice not to limit the preemption exception in § 7707(b)(1) in such a manner.

Bebe's reliance on *Gordon* to bolster its argument is misplaced. As numerous decisions have held, *Gordon*'s references to "traditionally tortious or wrongful conduct" do not require plaintiffs to literally plead and prove the elements of common law fraud to avoid preemption. *See, e.g.*, *Wagner v. Spire Vision*, 2014 WL 889483, at *3-4 (N.D. Cal. Mar. 3, 2014) (citing five cases) ("The great weight of district court and state court decisions have agreed that a showing of reliance and damages is not necessary."). Bebe does not cite, and Plaintiff has not found any decisions

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 5

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

reading *Gordon* otherwise. Rather, courts apply *Gordon* according to its terms: where plaintiffs plead only "nondeceptive statements or omissions," their claims are preempted. *See, e.g.*, *Andrews v. Conversion Squared Corp.*, 2020 WL 3978063, at *2–3 (C.D. Cal. May 8, 2020) ("Plaintiffs do not really allege deception, period, instead taking issue with a variety of missing information" in "from" fields.). Put differently, plaintiffs seeking to avoid preemption need only show some degree of materiality. *See Silverstein v. Keynetics Inc.*, 2016 WL 7475616, at *3–4 (N.D. Cal. Dec. 29, 2016), *aff'd*, 727 F. App'x 244, 246 (9th Cir. Mar. 6, 2018) ("The e-mails' use of the LinkedIn.com domain name is not materially false or misleading within the meaning of the CAN-SPAM Act.").

### C. Bebe's Deceptions Are More Than Bare Immaterial Errors.

The only question, therefore, is whether it is "apparent from the face" of Plaintiffs' Complaint, *Sams*, 713 F.3d at 1179, that the misrepresentations they complain of are merely "bare immaterial error[s]." *Gordon*, 575 F.3d at 1061 (quotations omitted). It is not. Plaintiffs are not complaining of "fanciful" domain names or "from" fields that fail an invented "labeling requirement." *Id.* at 1063–64. To the contrary, Plaintiffs complain of Bebe's barrage of emails laden with false subject lines—*i.e.*, its false time-scarcity tactics. Those tactics are plainly material to the behavior of ordinary consumers.

As alleged, "[f]alse time scarcity claims harm consumers by manipulatively distorting their decision-making to their detriment." Compl. ¶ 36. As one report cited in the Complaint concludes, "[f]alse or misleading scarcity claims can change the behaviour of consumers." Compl., ¶ 33 (citing U.K. Competition & Mkts. Auth., Online Choice Architecture—How Digital Design Can Harm Competition and Consumers 27 (2022)). Specifically, "[f]alse scarcity claims are psychologically effective because, as 'considerable evidence' suggests, 'consumers react to scarcity and divert their attention to information where they might miss opportunities.'" Compl. ¶ 33. One study found that "customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited." *Id.* ¶ 38. *Littlejohn*, 2024 WL 4451955, at *3 (fact pleadings "accept[ed] as true" with "reasonable inferences [drawn] in favor" of Plaintiffs).

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 6

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

All of this accords with the well-worn federal law of materiality, not to mention common sense. "Whether in tort or contract law," materiality focuses on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Kousisis v. United States*, 145 S. Ct. 1382, 1396 (2025) (applying wire fraud statute). A fact is material "if a reasonable person would attach importance to it in deciding how to proceed, or if the defendant knew (or should have known) that the recipient would likely deem it important." *Id.* (citation omitted). Representations about the timing and duration of sales, discounts, and other special offers are, at bottom, representations about prices. If a consumer is faced with the "LAST CALL: Up to 80% Off Sale" or "Up to 40% OFF Fall Essentials Ends Tonight!" the consumer must decide whether to take advantage of the deal by purchasing during the "last call" or "tonight" after which they lose the opportunity. Compl., ¶¶ 59, 62; *see id.* at ¶¶ 29-112, Ex. A. And price is obviously a material fact—perhaps *the* material fact—affecting the behavior of consumers. *See* Compl. ¶ 32. If a consumer is in the market for a product or products they believe will cost more tomorrow, they will naturally "attach importance," *Kousisis*, 145 S. Ct. at 1396, to the fact that the price will be less if they buy it today.

Recent decisions in this District affirm the application of the state law CAN-SPAM exception to CEMA in this context. *Nike, Inc.*, No. 2026 WL 100731, at *2 (citing Gordon, 575 F.3d at 1062). Here, as in *Nike*, Plaintiffs allege a "pattern of Nike sending Washington residents commercial e-mails with subject lines containing allegedly false or misleading information regarding the duration or availability of sales promotions, falling directly under CEMA's subject-line provision which fits under the rights reserved to states within the CAN-SPAM Act's savings clause." Id. *See also Harrington v. Vineyard Vines, LLC*, No. C25-1115 TSZ, __ F. Supp. 3d __, 2025 WL 3677479, at *19 (W.D. Wash. Dec. 18, 2025), *reconsideration denied sub nom.* 2026 WL 125134 (W.D. Wash. Jan. 16, 2026) (CEMA not preempted by CAN-SPAM Act"); *Kempf, et al., v. FullBeauty Brands Ops.*, No. C25-1141 TSZ, 2026 WL 395677, at *4-*5 (W.D. Wash. Feb. 12, 2026) (same). *Nike*, *Harrington*, and *FullBeauty* are recent, on point, and dispositive.

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 7

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

As for common sense, Bebe's argument flies in its face. Bebe is a "sophisticated commercial enterprise" that has "engaged in persistent marketing through mass email campaigns across the United States." Compl. ¶ 99. Its email marketing platform ("Klaviyo") enables it to, *inter alia*, track how many recipients engage with its marketing materials and to what extent. *See id.* ¶ 103. And email subject lines offer limited space within which Bebe can communicate "above the fold" messages that come to consumer attention even if the emails are immediately deleted or their contents ignored. Why, then, would Bebe choke its consumers' inboxes like coffee grounds in a clogged sink with email after email with subject lines cautioning, "LAST CALL" or "FINAL HOURS?" Why would Bebe expend all this time and effort broadcasting mere immaterialities? The only plausible answer is, of course it would not. Bebe would not waste valuable marketing dollars on marketing messages unless they worked. And Bebe's false-urgency tactics work because they exploit well documented features of consumer psychology and behavior. *See id.* at ¶¶ 29-112. In other words, Bebe's tactics work because they misrepresent facts to which consumers "attach importance." *Kousisis*, 145 S. Ct. at 1396. Nothing in the CAN-SPAM Act or *Gordon* requires more to avoid preemption.

Bebe cites one decision from the Washington Court of Appeals, *Brummet v. Wash. Lottery*, 288 P.3d 48, (Wash. Ct. App. 2012), for its contention that "Washington law generally holds that promotional urgency is not material absent additional facts." Mot., 7. *Brummet*, concerned with whether claims that raffle tickets were "going fast" misrepresented "something of material importance," is readily distinguishable. To represent nonspecifically that certain widgets are "going fast" does not, in itself, say anything about how many widgets remain or how long consumers can expect those widgets to remain available for sale. Indeed, *Brummet* does not even clarify whether the plaintiff's "going fast" claim failed for lack of materiality or for lack of a misrepresentation. It's also difficult to imagine a definite standard under which a vague statement like "going fast" could be found false. If, by contrast, the *Brummet* defendant had used Bebe's tactics and represented that the raffle "Ends Tomorrow," Comp. ¶ 62, when it did not, the representation would have communicated urgency "when in fact there is no urgency," making it

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 8

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

actionably deceptive. *Stephens v. Omni Ins. Co.*, 159 P.3d 10, 19 (Wash. Ct. App. 2007) ("The increasingly urgent tone ('ATTENTION!') and message ('ACTIVITY PENDING TEN (10) days') [of defendant's dunning letters] suggests that the recipient's situation is becoming worse with each passing day when in fact there is no urgency."). Further, *Brummett's* finding that "going fast" was not materially deceptive is refuted by the later holding in *Brown*, that "'representations of fact[s]–*like the duration or availability of a promotion. . .*' are subject to CEMA's subject-line standards." *Harrington*, 2025 WL 3677479, at *1 (quoting *Brown*, 4 Wash. 3d at 595–96).

In any event, materiality is a complex mixed question of law and fact "typically … resolved by juries." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995). So, any doubts as to the materiality of Bebe's misrepresentations are to be doubly resolved against Bebe: once because it is not Plaintiffs' burden to plead materiality, but Bebe's burden to show Plaintiffs have pleaded themselves out of court with immaterialities, *see Sams*, 713 F.3d at 1179; and twice because Plaintiffs should be afforded the benefit of fact and expert discovery to demonstrate the plausible inference that Bebe sends its misleading subject lines precisely to impact consumer behavior. Indeed, at this stage, the Court must draw reasonable inferences in Plaintiffs' favor. *See Littlejohn*, 2024 WL 4451955, at *3. Bebe is not entitled to dismissal on the basis of preemption.

## II.   Plaintiffs' CEMA Claims are Not Barred by the Dormant Commerce Clause.

Constitutional challenges usually rest on what the Constitution says. Bebe, by contrast, seeks invalidation of a duly enacted state law based on what the Constitution does not say. The Dormant Commerce Clause is a complex area of constitutional law. "[E]xtreme caution is warranted before a court deploys this implied authority." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 390 (2023), *aff'g* 6 F.4th 1021 (9th Cir. 2021). The doctrine is practically moribund. *See Pork Producers*, 6 F.4th at 1033 ("While the dormant Commerce Clause is not yet a dead letter, it is moving in that direction."). Bebe's arguments demonstrate why that is the case.

### A.  CEMA Does Not Impermissibly Regulate Extraterritorial Conduct.

As for extraterritoriality, *Pork Producers* "substantially clarified" the meaning of cases (like *Healy v. Beer Institute*, 491 U.S. 324 (1989), cited by Bebe, Mot. 8–11) invoking this

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 9

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

principle of dormant Commerce Clause jurisprudence. *Flynt v. Bonta*, 131 F.4th 918, 924 (9th Cir. 2025). To begin with, the Court "unanimously disavow[ed]," *Pork Producers*, 598 U.S. at 389 n.4, the "virtual[] *per se* invalid[ity]" rule proffered by Bebe. Mot. 9. Further, the Court clarified, its extraterritoriality cases are fundamentally antidiscrimination cases: "each typifies the familiar concern with preventing purposeful discrimination against out-of-state economic interests." *Flynt*, 131 F.4th at 924 (quoting *Pork Producers*, 598 U.S. at 371). Statutes successfully challenged as impermissible extraterritorial regulation each had the "*specific* impermissible extraterritorial effect" of "prevent[ing] out-of-state firms from undertaking competitive pricing or depriv[ing] businesses and consumers in other States of whatever competitive advantages" they had. *Id.* (quoting *Pork Producers*, 598 U.S. at 374) (internal quotation marks omitted). These cases thus enforced the core prohibition on "impermissible discriminatory purpose[s]," *not* "any broader, freestanding extraterritoriality principle." *Id.* (citing *Pork Producers*, 598 U.S. at 373).

Take *Healy* itself. It involved a statute that "required out-of-state beer merchants to affirm that their in-state prices were no higher than those they charged in neighboring States." *Pork Producers*, 598 U.S. at 372. This protectionism was out in the open and uncontested: the statute did not "even try to cloak its discriminatory purpose" in applying only to "interstate firms" and so "clearly discriminated against interstate commerce." *Id.* at 373 (quotations omitted). *Healy* and the other extraterritoriality cases are *nothing* like this one. The sole "extraterritorial impact" which Bebe offers is the speculative and irrelevant hypothetical possibility involving an email that is drafted, transmitted and read outside the State of Washington. Mot. 9. Here, the "*specific*" discriminatory effects condemned by *Healy* and cases like it, *Flynt*, 131 F.4th at 924 (quoting *Pork Producers*, 598 U.S. at 374), are absent and there is no discriminatory or protectionist effect to be found. There is no appreciable impact on interstate commerce at all. The negative implications of the Commerce Clause simply do not enforce "any broader, freestanding extraterritoriality principle" that Macy's hypothetical might be supposed to violate. *Id.*; *see also id.* at 929 (same).

Nothing in *Sam Francis Foundation v. Christies, Inc.*, 784 F.3d 1320 (9th Cir. 2015) (*en banc*), as relied on by Bebe, Mot. 9, requires a different result. That case dealt with a California

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 10

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

statute requiring payment of royalties to artists from sales of their art "whenever the seller resides in California or the sale takes place in California." *Id.* at 1323 (quotations omitted). The majority held in relevant part that the royalty requirement "violate[d] the dormant Commerce Clause" when "applied to out-of-state sales by California residents." *Id.* at 1323.

To begin, *Sam Francis's* holding as to out-of-state sales by California residents did not survive *Pork Producers*. *See Flynt*, 131 F.4th at 931 (noting question as open). As the partial *Sam Francis* dissent presciently observed, in *Healy* and the other extraterritoriality cases, "the laws at issue … had a direct effect on out-of-state commercial transactions by regulating the price or terms of such transactions, or by otherwise requiring an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another." *Sam Francis*, 784 F.3d at 1331 (Reinhardt, J., dissenting in part) (internal citation omitted). In other words, "cases like *Healy* … turned on an impermissible discriminatory purpose against out-of-state economic interests, not any freestanding extraterritoriality principle." *Flynt*, 131 F.4th at 929. In light of *Pork Producers*, there is no question that the *Sam Francis* majority got it wrong, and the partial dissent got it right.

But even a full-throated reading of *Sam Francis* cannot save Bebe as the case is readily distinguishable. Washington has a legitimate interest in protecting its residents from conduct it deems harmful or undesirable. *See Edgar v. MITE Corp.*, 457 U.S. 624, 644 (1982) ("[P]rotecting local investors is plainly a legitimate state objective"); *Heckel*, 24 P.3d at 410 (discussing harms from "[d]eceptive spam" to "individual Internet users" protected against by CEMA). No such interest was served by the California statute in *Sam Francis*, which protected artists' rights to royalties no matter where they resided. *See Sam Francis*, 784 F.3d at 1323. Thus, CEMA requires a much closer connection to Washington than statute in *Sam Francis* required to California. *See id.* at 1324 ("[N]o other connection to California need exist" besides the seller's residence.).

Even within the terms of the "freestanding extraterritoriality principle," *Flynt*, 131 F.4th at 929, disavowed by *Pork Producers* but enforced by *Sam Francis*, Bebe has simply failed to explain why it should matter at all where a Washington resident happens to be at the moment Bebe presses "Send" on a piece of deceptive spam addressed to her. *See Heckel*, 24 P.3d at 412 (rejecting

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 11

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

extraterritoriality challenge) (CEMA "does not burden interstate commerce by regulating when or where recipients may open the proscribed … messages."); *MaryCLE, LLC v. First Choice Internet, Inc.*, 890 A.2d 818, 842 (Md. Ct. Spec. App. 2006) (rejecting extraterritoriality challenge) ("MCEMA does not regulate exclusively extraterritorial conduct because its focus is not on when or where recipients may open the proscribed ... messages." (internal quotation marks omitted) (cited by Bebe, Mot. 10. What matters is Washington's interest in protecting Washington residents. *See Edgar*, 457 U.S. 624 at 644; *Heckel*, 24 P.3d at 412 ("[T]he Act addresses the conduct of spammers in targeting Washington consumers."); *MaryCLE*, 890 A.2d at 842–43 ("[T]he Act addresses the conduct of spammers in targeting Maryland consumers." (internal quotation marks, brackets omitted)), cited by Mot. 10. Bebe's extraterritoriality arguments fail.

### B. CEMA Protects Washington Residents from Deceptive Practices Without Unduly Burdening Interstate Commerce.

"Honesty is the best policy." For many, the centuries-old maxim is noncontroversial. Bebe, however, claims that CEMA compliance—which merely requires that companies not transmit false or misleading information in the subject lines of its marketing emails—is an onerous prospect. Defendant complains that CEMA imposes "substantial and excessive" burdens on interstate commerce such that, to avoid CEMA's statutory penalties, "nationwide retailers must either build complex state-specific email segmentation systems or conform all subject lines nationwide to Washington's strict subject-line standard." Mot. 11. There is, of course, a simpler and cheaper alternative to Defendant's grand proposal: one might simply tell the truth. Regardless, and contrary to Defendant's suggestion, CEMA doesn't create some new and oppressive, "strict subject-line standard" with which national retailers must contend. *Id.* As the Supreme Court of Washington makes clear: CEMA merely imposes a "requirement of truthfulness" which serves to enable commerce rather than burden it. *State v. Heckel*, 24 P.3d 404, 411 (Wash. 2001). CEMA, a legitimate exercise of state authority aimed at protecting residents from deceptive practices, withstands Defendant's undue burden argument.

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 12

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

When determining if a state law violates the Dormant Commerce Clause, courts employ the two-tiered approach provided in *Pike v. Bruce Church, Inc.* Under *Pike*, those seeking invalidation of a state law must first show that the subject legislation "imposes a substantial or significant burden on interstate commerce." *Flynt*, 131 F.4th at 925 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)). Then, the challenger must show that this burden is "clearly excessive in relation to the putative local benefits." *Id.* The point of *Pike* balancing is to ferret out any "discriminatory purpose[s]" behind the "practical effects" of "facially neutral" laws. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 377-78 (2023). Much like the plaintiffs in *Pork Producers*, Bebe "nowhere suggest[s] that an examination of [CEMA's] practical effects in operation would disclose purposeful discrimination against out-of-state businesses." *Id*. at 379. Beginning so far "outside *Pike*'s heartland" is "not an auspicious start." *Id.* at 380.

Bebe's argument fails at step one. Burdens on interstate commerce are "substantial or significant" under *Pike* "only in rare cases." *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1032, (9th Cir. 2021). Mere "compliance costs, without more," do not qualify. *Id.*; *see also Flynt*, 131 F.4th at 932 (noting both *Pork Producers* decisions rejected *Pike* challenges to a statute imposing "millions (if not billions)" in national compliance costs) ("*Pike* protects the interstate market, not particular interstate firms" (internal quotation marks omitted)). Here, CEMA compliance can impose no more than a fraction of the compliance costs in *Pork Producers* and poses absolutely no threat to "the free flow of commerce from state to state." *Flynt*, 131 F.4th at 932-33 (quoting *Pork Producers*, 6 F.4th at 1033). Additionally, rather than burden interstate commerce, CEMA promotes it. CEMA's truthfulness requirement applies to all companies, wherever they are located, and "does not burden commerce at all but actually facilitates it by eliminating fraud and deception." *Heckel*, 24 P.3d at 411 (internal quotation marks omitted). Because CEMA protects Washington residents from deceptive marketing tactics, those consumers can be confident that representations made by out-of-state companies are true.

Bebe suggests that "state laws may not, in practical effect, compel out-of-state entities to comply with a single state's regime nationwide." Mot. 11. True, statutes that create "inconsistent

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 13

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

regulation of activities that are inherently national or require a uniform system of regulation" may impose burdens cognizable under *Pike*. *Flynt*, 131 F.4th at 932 (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 952 (9th Cir. 2013)). But these cases are limited to "the categories of 'transportation' or 'professional sports leagues.'" *Eleveurs*, 729 F.3d at 952 (quoting *Valley Bank of Nev. v. Plus Sys., Inc.*, 914 F.2d 1186, 1192 (9th Cir. 1990)) (brackets omitted). And in the absence of any state law requiring falsity or deception in the subject lines of commercial email, there can be no threat of inconsistency with CEMA's "requirement of truthfulness." *Heckel*, 24 P.3d at 411.

As for step two of *Pike* balancing, Bebe claims that, where CEMA is concerned, "any purported local benefit is extremely limited, if it exists at all." The Supreme Court of Washington, sitting *en banc*, disagrees and has articulated CEMA's "local benefits" in detail:

> The Act protects the interests of three groups—ISPs, actual owners of forged domain names, and e-mail users. The problems that spam causes have been discussed in prior cases and legislative hearings. … To handle the increased e-mail traffic attributable to deceptive spam, ISPs must invest in more computer equipment. … Along with ISPs, the owners of impermissibly used domain names and e-mail addresses suffer economic harm. … Deceptive spam harms individual Internet users as well. … [T]he use of false or misleading subject lines further hampers an individual's ability to use computer time most efficiently. When spammers use subject lines such as 'Hi There!,' 'Information Request,' and 'Your Business Records,' it becomes virtually impossible to distinguish spam from legitimate personal or business messages. Individuals who do not have flat-rate plans for Internet access but pay instead by the minute or hour are harmed more directly, but all Internet users (along with their ISPs) bear the cost of deceptive spam.

*Heckel*, 24 P.3d at 410 (internal quotation marks omitted).

Rather than confront CEMA's local benefits as provided in *Heckel*, Bebe simply observes that "CAN-SPAM already provides meaningful and overlapping protections." Mot. 10-11. Here, Bebe seeks to enter the province of legislatures. If Congress determined that state laws were unnecessary following CAN-SPAM's enactment, it would not have created an exception for them. Instead, Congress expressly approved state regulation of false or deceptive commercial email, even in light of its "inherently interstate nature," S. Rep. No. 108-102, at 21, by excepting rules that

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 14

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

prohibit "falsity or deception," 15 U.S.C. § 7707(b), from CAN-SPAM preemption. "Congress, in other words, chose to abandon any search for uniformity in dealing with the problems" of false or deceptive commercial email "and decided to suffer a medley of attitudes and philosophies on the subject." *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 104–05 (1963) (discussing preemption exception in 29 U.S.C. § 164(b)).

Bebe's assertions that CEMA violates the Dormant Commerce Clause directly contravene governing decisions by the U.S. Supreme Court, the Ninth Circuit, and the Supreme Court of Washington. Both its extraterritoriality and undue burden arguments fail.

**III.   Since Plaintiffs' CEMA Claims Are Neither Preempted nor Unconstitutional, Their CPA Claims Survive.**

Bebe's singular basis for dismissal of Plaintiffs' CPA claims is that they stand or fall with Plaintiffs' CEMA claims. *See* Dkt. No. 20 at 11. Because Plaintiffs' CEMA claims survive for the reasons provided above, so too do their CPA claims.

**CONCLUSION**

Accordingly, Plaintiffs respectfully request that the Court deny Defendant's Motion to Dismiss in its entirety.

RESPECTFULLY SUBMITTED AND DATED this 20th day of February, 2026.

/s/ Andrew K. Murray
J. Gerard Stranch, IV, *pro hac vice* forthcoming
Andrew K. Murray, *pro hac vice*
Michael C. Tackeff, *pro hac vice*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615) 254-5419
gstranch@stranchlaw.com
mtackeff@stranchlaw.com
amurray@stranchlaw.com

/s/ Samuel J. Strauss
Samuel J. Strauss, WSBA #46971
Raina C. Borrelli, *pro hac vice forthcoming*

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 15

**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419

**STRAUSS BORRELLI, PLLC**
980 North Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

Lynn A. Toops, *pro hac vice*
Natalie A. Lyons, *pro hac vice*
Ian R. Bensberg, *pro hac vice*
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel.: (317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

I certify that this memorandum contains no more than 5,280 words, in compliance with the Local Civil Rules.

*/s/ Andrew K. Murray*

*Attorneys for Plaintiffs*

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 16

**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615) 254-5419

**CERTIFICATE OF SERVICE**

I, Andrew K. Murray, hereby certify that, on this date, I caused the foregoing to be electronically filed with the Court using the Court's CM/ECF system which will send an electronic copy to all parties and/or their counsel of record.

DATED this 20th day of February, 2026.

*/s/ Andrew K. Murray*
Andrew K. Murray

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
(2:25-cv-02388-BJR) – 17

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615)254-5419