The Honorable Barbara J. Rothstein

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

KELLY ISBELL and HALEY HENDERSON, on their own behalf and on behalf of others similarly situated,

Plaintiffs,

and

STATE OF WASHINGTON,

Plaintiff-Intervenor,

v.

BEBE STORES, INC.,

Defendant.

NO. 2:25-cv-02388-BJR

PLAINTIFF-INTERVENOR STATE OF WASHINGTON'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## I.     INTRODUCTION

Washington's Commercial Electronic Mail Act (CEMA) is constitutional. The statute protects Washington residents from deceptive commercial email messages and makes sending them a violation of the Washington Consumer Protection Act (CPA). The federal Controlling the Assault of Non-Solicited Pornography and Marketing Act (CAN-SPAM) does not preempt CEMA. In arguing otherwise, Defendant Bebe Stores, Inc. ("Bebe") tries to impose on plaintiffs a heightened fraud standard that is not found anywhere in either CEMA or CAN-SPAM. CAN-SPAM's preemption savings clause specifically carves out and preserves state statutes like

PLAINTIFF-INTERVENOR STATE OF
WASHINGTON'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS - 1
(2:25-cv-02388-BJR)

CEMA that prohibit misleading or deceptive emails. Bebe's cited authority does not support its argument that CEMA plaintiffs must plead fraud or another tort to avoid preemption, nor does Bebe acknowledge the many courts that have rejected that argument.

CEMA also does not discriminate against out-of-state interests or otherwise violate the dormant Commerce Clause. Like many state laws, CEMA's protection may, at times, have a practical effect on people or companies outside Washington, but that occasional extraterritorial impact does not offend the United States Constitution. In short, Bebe's arguments misunderstand federal constitutional law and the operation of the interconnected modern economy.

This Court should deny the motion to dismiss, just as other Washington federal courts have done in five recent orders. *See Shahpur v. Ulta Salon Cosmetics & Fragrance, Inc.*, No. C25-284-RLP, 2026 WL 571122 (E.D. Wash. Feb. 27, 2026); *Jerde v. Bylt*, 2:25-CV-01496-JHC, 2026 WL 415445 (W.D. Wash. Feb. 13, 2026); *Kempf v. FullBeauty Brands Operations LLC*, No. C25-1141-TSZ, 2026 WL 395677 (W.D. Wash. Feb. 12, 2026); *Harrington v. Vineyard Vines, LLC*, No. C25-1115-TSZ, 2025 WL 3677479 (W.D. Wash. Dec. 18, 2025), *reconsideration denied sub nom*., 2026 WL 125134 (W.D. Wash. Jan. 16, 2026); *Ma v. Nike, Inc.*, No. C25-1235-JLR, 2026 WL 100731 (W.D. Wash. Jan. 14, 2026). No Washington federal court has found the challenged portion of CEMA unconstitutional or preempted by CAN-SPAM.

## II.    BACKGROUND

Adopted in 1998, CEMA's application to email is narrow. At issue here, CEMA prohibits a person from sending email marketing messages containing "false or misleading information," specifically "in the subject line," to email addresses the sender knows or has reason to know belongs to Washington State residents. Wash. Rev. Code § 19.190.020(1)(b). CEMA does not address the content of emails, and unlike CAN-SPAM, CEMA does not contain disclosure requirements about the commercial nature of the email, the location of the sender, or opt-out procedures. *Compare* Wash. Rev. Code § 19.190.020(1) *with* 15 U.S.C. § 7704. While penalties

PLAINTIFF-INTERVENOR STATE OF
WASHINGTON'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS - 2
(2:25-cv-02388-BJR)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

for a CAN-SPAM violation can total $53,088 per email (plus consumer restitution) as of 2025, *see* Fed. Trade Comm'n, CAN-SPAM Act: A Compliance Guide for Business (January 2024), https://www.ftc.gov/business-guidance/resources/can-spam-act-compliance-guide-business, a violation of CEMA is the greater of $500 or actual damages as of 2026, Wash. Rev. Code § 19.190.040(1).[1] Importantly, CEMA has a private right of action for individual consumers, while CAN-SPAM is enforced by federal agencies, state attorneys general, and certain internet providers. *Compare* Wash. Rev. Code § 19.190.040(1) *with* 15 U.S.C. § 7706.

CEMA was designed to address the local impact of spam email on Washington consumers and businesses. The Attorney General's Office reported to the Legislature that during the five-month period before CEMA's passage, of 322 complaints received about unsolicited email, many were commercial advertisements and "spam [was] the highest category of consumer complaints" the office received overall. H. Comm. on Energy & Utilities, 55th Leg., Reg. Sess., House Bill Report on H.B. 2752 (Wash. 1998). Legislative testimony emphasized that CEMA "allows expansion of Internet usage while curtailing abuses before they reach crisis." S. Comm. on Energy, Technology & Telecommunications, 56th Leg., Reg. Sess., Senate Bill Report on H.B. 1037 (Wash. 1999).

### III.    ARGUMENT

The State intervenes for the limited purpose of defending CEMA's constitutionality pursuant to 28 U.S.C. § 2403(b). It takes no position with respect to other issues raised in the litigation, including whether the email subject lines at issue are false or misleading as a matter of law. Overall, the State agrees with the arguments regarding CEMA's constitutionality in Plaintiffs' response brief. Dkt. 24 at 3-15. The State writes separately, however, to offer the perspective of the State's chief law enforcement officer as to CEMA's constitutionality, its

---

[1] Pursuant to H.B. 2274 (2026), the Washington Legislature lowered CEMA's per violation penalty from $500 to $100. The bill is awaiting the Governor's signature as of the date of this brief.

PLAINTIFF-INTERVENOR STATE OF
WASHINGTON'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS - 3
(2:25-cv-02388-BJR)

proper interpretation, and the importance of private enforcement of consumer protection statutes like CEMA. *See Scott v. Cingular Wireless*, 161 P.3d 1000, 1006 (Wash. 2007) (observing "[p]rivate actions by private citizens are now an integral part of CPA enforcement" and that consumers "bringing actions under the CPA do not merely vindicate their own rights; they represent the public interest and may seek injunctive relief even when the injunction would not directly affect their own private interests").

**A.    CAN-SPAM Does Not Preempt CEMA Claims About Deceptive Subject Lines**

Preemption is a constitutional issue warranting the State's intervention under Rule 5.1. *See Gordon v. Virtumundo, Inc*., 575 F.3d 1040, 1060 (9th Cir. 2009) (citing U.S. Const. art. VI, cl. 2) (observing preemption doctrine "derives from the Supremacy Clause of the United States Constitution"); *ThermoLife Int'l LLC v. NeoGenis Labs Inc.*, No. CV-18-02980-PHX-DWL, 2020 WL 6395442, at *16 (D. Ariz. Nov. 2, 2020) (stating because preemption claims are constitutional in nature, state must be allowed to address such claims).

Any preemption analysis begins with the "presumption against supplanting the historic police powers of the States by federal legislation unless that is the clear and manifest purpose of Congress." *Virtumundo*, 575 F.3d at 1060 (cleaned up). "This presumption against preemption leads us to the principle that express preemption statutory provisions should be given narrow interpretation." *Id*. (cleaned up). Bebe, as the party "seeking to invalidate a state law based on preemption bear[s] the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." *Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1227–28 (9th Cir. 2013) (en banc) (cleaned up). "Consumer protection is an area of traditional state authority creating a presumption against federal preemption." *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1130 (W.D. Wash. 2012) (citing *Meilleur v. AT & T Inc.*, No. 11–1025 MJP, 2011 WL 5592647 at *3 (W.D. Wash. Nov. 16, 2011)). Thus, the presumption against preemption applies to both the *existence* and *scope* of the alleged preemption. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

PLAINTIFF-INTERVENOR STATE OF
WASHINGTON'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS - 4
(2:25-cv-02388-BJR)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

**1.     CAN-SPAM exempts consumer protection statutes like CEMA**

CAN-SPAM was never intended to replace traditional state regulation of unfair and deceptive acts and practices (like CEMA). Although Bebe wishes the Court to focus on one aspect of CAN-SPAM's intent—the need for national regulations—the company ignores the primary purpose of CAN-SPAM: to reduce the sheer volume of unwanted commercial email messages. In fact, the Senate Report accompanying the bill does not list anything akin to "creating a uniform national system of regulations" among its purposes:

> The purposes of this legislation are to: (i) prohibit senders of electronic mail (e-mail) for primarily commercial advertisement or promotional purposes from deceiving intended recipients or Internet service providers as to the source or subject matter of their e-mail messages; (ii) require such e-mail senders to give recipients an opportunity to decline to receive future commercial e-mail from them and to honor such requests; (iii) require senders of unsolicited commercial e-mail (UCE) to also include a valid physical address in the e-mail message and a clear notice that the message is an advertisement or solicitation; and (iv) prohibit businesses from knowingly promoting, or permitting the promotion of, their trade or business through e-mail transmitted with false or misleading sender or routing information.

S. Rep. 108-102, at 1 (2003). In short, CAN-SPAM (like CEMA before it) was consumer protection legislation, not legislation designed to benefit companies that send mass email.

While CAN-SPAM does indeed set some uniform national standards for certain technical issues like opt-out mechanisms, sender identification, and postal address disclosure, none of the national standards in CAN-SPAM relate to traditional consumer protection regulations that addressed unfair and deceptive acts and practices in email:

> The legislation would supersede State and local statutes, regulations, and rules that expressly regulate the use of e-mail to send commercial messages except for statutes, regulations, or rules that target fraud or deception in such e-mail. Thus, **a State law requiring some or all commercial e-mail to carry specific types of labels, or to follow a certain format or contain specified content, would be preempted. By contrast, a State law prohibiting fraudulent or deceptive headers, subject lines, or content in commercial e-mail would not be preempted**. Given the inherently interstate nature of e-mail communications, the Committee believes that this bill's creation of one national standard is a proper exercise of the Congress's power to regulate interstate commerce that is essential to resolving the significant harms from spam faced by American consumers, organizations, and businesses throughout the United States. This is particularly true because, in contrast to telephone numbers, e-mail addresses do not reveal the

PLAINTIFF-INTERVENOR STATE OF
WASHINGTON'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS - 5
(2:25-cv-02388-BJR)

State where the holder is located. As a result, a sender of e-mail has no easy way to determine with which State law to comply. **Statutes that prohibit fraud and deception in e-mail do not raise the same concern, because they target behavior that a legitimate business trying to comply with relevant laws would not be engaging in anyway**.

S. Rep. 108-102, at 21-22 (2003) (emphasis added). CAN-SPAM also specifically exempts other non-email consumer protection statutes. *Id.* at 22. In short, CAN-SPAM was never trying to "fix" a problem with consumer protection regulations like CEMA. *See Hypertouch, Inc. v. ValueClick, Inc.*, 192 Cal. App. 4th 805, 824, 123 Cal. Rptr. 3d 8 (2011) ("The legislative history also makes clear . . . that [CAN-SPAM's] preemption provision was largely intended to target state statutes imposing content requirements on commercial e-mails, while leaving states free to regulate the use of deceptive practices in commercial e-mails in whatever manner they chose.").

It is no surprise then that while CAN-SPAM's preemption clause states that the statute supersedes any state law that "regulates the use of electronic mail to send commercial messages," it expressly exempts "any such statute" that "prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto." 15 U.S.C. § 7707(b)(1). The CEMA provision at issue here does just that, prohibiting any email that "[c]ontains false or misleading information in the subject line." Wash. Rev. Code § 19.190.020(1)(b). Not only is this consistent with the history of CAN-SPAM, this plain language ends the preemption analysis. *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 939 (9th Cir. 2024) (to interpret an express preemption clause, a court is required "to look to the plain wording of the statute and surrounding statutory framework to determine whether Congress intended to preempt state law").

**2.     A plaintiff need not plead common law tort elements to avoid preemption**

Despite CAN-SPAM's plain language, Bebe presses a restrictive reading of the preemption clause, asserting it saves only traditional tort theories like fraud from preemption. Dkt. 20 at 4-8 (relying primarily on *Virtumundo*). This is incorrect as a matter of law and cannot be squared with Bebe's own authorities.

PLAINTIFF-INTERVENOR STATE OF
WASHINGTON'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS - 6
(2:25-cv-02388-BJR)

Sixteen years ago, *Virtumundo* addressed the scope of CAN-SPAM's preemption clause as an issue of first impression in this circuit, relying in part on the then-only federal circuit court decision addressing the clause: *Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348 (4th Cir. 2006). *Virtumundo*, 575 F.3d at 1059-60. However, neither *Virtumundo* nor *Omega* held that common law torts like fraud are the only state law claims saved from the CAN-SPAM preemption clause. To the contrary, both cases *confirm* the exception applies broadly to "traditionally tortious <u>or wrongful conduct</u>." *Virtumundo*, 575 F.3d at 1062 (quoting *Omega*, 469 F.3d at 354) (emphasis added). Far from supporting Bebe's arguments, *Virtumundo* explained state law claims about deceptive email subject lines were not preempted. *Id*. at 1062 (observing legislative intent that "a State law prohibiting *fraudulent or deceptive* headers, subject lines, or content in commercial e-mail would not be preempted").

Thus, because CEMA's subject-line provision prohibits only "falsity" or "deception" in the subject-line of commercial e-mails, it "falls squarely within this area reserved to the States[.]" *Harrington*, 2025 WL 3677479, at *1; *see also Ma*, 2026 WL 100731, at *2; *Shahpur*, 2026 WL 571122, at *4 ("The use of the words 'falsity or deception' indicates Congress intended the CAN-SPAM exception to apply more broadly than claims of fraud."); *Kempf*, 2026 WL 395677, at *4, n.8 ("States are expressly permitted [under CAN-SPAM's savings clause] to provide private avenues of relief for false or deceptive commercial e-mails."). This conclusion is supported by the Senate Report accompanying CAN-SPAM, which explained that although the purpose of the CAN-SPAM Act was to impose a single national standard for the content of commercial e-mail, "[s]tatutes that prohibit fraud and deception in e-mail do not raise the same concern, because they target behavior that a legitimate business trying to comply with relevant laws would not be engaging in anyway." S. Rep. No. 108-102, at 21-22 (2003).

In any event, *Virtumundo* did not directly address deceptive email subject lines. Instead, it considered whether CAN-SPAM preempted the plaintiff's claims under CEMA's provision (1)(a), which prohibits email that "misrepresents or obscures" information about the sender.

PLAINTIFF-INTERVENOR STATE OF
WASHINGTON'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS - 7
(2:25-cv-02388-BJR)

Wash. Rev. Code § 19.190.020(1)(a). That provision is not at issue here. And unlike this case, the *Virtumundo* plaintiff admitted none of the emails at issue misled or deceived him "in any way." *Virtumundo*, 575 F.3d at 1063. Rather, he asserted the sender should have been "Virtumundo" rather than the abbreviated domain names they used. *Id*. at 1063-64. The Ninth Circuit concluded that such "technical" allegations of "non-deceptive" inaccuracies or omissions are "at best" claims for "incomplete or less than comprehensive information." *Id*. at 1064. Understandably, the court concluded that to the extent that provision (1)(a) addressed non-deceptive acts and practices, this did not rise to the level of "wrongful conduct" or "falsity or deception" necessary to avoid preemption. *Id*. at 1062, 1064. The *Omega* court likewise was focused on state law claims that could potentially impose strict liability for "insignificant inaccuracies" or "bare error" rather than "falsity or deception." 469 F.3d at 352-56. This case, in contrast, is about provision 1(b), which <u>only</u> prohibits "false or misleading information" and cannot be read to impose liability for simple mistakes. *Virtumundo* and *Omega* thus do not support preemption.

Further, in *Virtumundo*, the Ninth Circuit acknowledged that CEMA's statutory framework at least suggested CEMA "extends only to deceptive commercial e-mail" rather than non-deceptive acts or mere clerical errors. 575 F.3d at 1059, n.17. When the Ninth Circuit decided *Virtumundo* in 2009, however, it observed that how narrowly or broadly to interpret CEMA was unsettled. *Id.* at 1059. The *Virtumundo* court thus concluded that "state courts may ultimately mold CEMA's broad language so as to cabin its breadth or interpret the law in conformity with federal legislation." *Id*. Last year, following certification from the Western District of Washington, the Washington State Supreme Court did just that in *Brown v. Old Navy, LLC*, 567 P.3d 38, 47 (Wash. 2025).

In *Brown*, the court confirmed that CEMA's subject line provision does not prohibit technical errors or "mere puffery." *Id*. The *Brown* court held CEMA's subject line provision addresses deceptive "representations of fact—like the duration or availability of a promotion, its

PLAINTIFF-INTERVENOR STATE OF
WASHINGTON'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS - 8
(2:25-cv-02388-BJR)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

terms and nature, the cost of goods, and other facts Washington residents would depend on in making their consumer decisions." *Id.* In short, CEMA's subject line provision prohibits false or deceptive statements about facts that would be important to consumer decision making, and to the extent there was any question, *Brown* thus harmonizes CEMA with CAN-SPAM.

### 3. A plaintiff need not specifically plead fraud to avoid preemption

Bebe spends considerable time addressing the elements of fraud in its motion. Dkt. 20 at 6-8. Consumer protection statutes such as CEMA do not sound in fraud, and "[t]he great weight of district court and state court decisions" reject a requirement that consumers plead "all the elements of common law fraud," including damages or reliance, to avoid preemption of their anti-spam law claims. *Wagner v. Spire Vision*, No. C 13-04952 WHA, 2014 WL 889483, at *2-4 (N.D. Cal. Mar. 3, 2014) (collecting cases); *Asis Internet Servs. v. Member Source Media, LLC*, No. C-08-1321 EMC, 2010 WL 1610066, at *3 (N.D. Cal. Apr. 20, 2010) (considering California's subject line provision, *Virtumundo*, and CAN-SPAM's preemption clause, and holding plaintiff "need not plead reliance and damages in order for its claim to be excepted from preemption"); *Hoang v. Reunion.com, Inc.*, No. C-08-3518 MMC, 2010 WL 1340535, at *6 (N.D. Cal. Mar. 31, 2010) (reversing dismissal under *Virtumundo*, holding failure to allege detrimental reliance was not proper grounds for dismissal).

Indeed, Congress explicitly chose not to use the word "fraud" in the CAN-SPAM preemption provision at issue here, even though it did in the next provision. *Ma*, 2026 WL 100731, at *3 (citing *Asis Internet Servs. v. Consumerbargaingiveaways, LLC*, 622 F. Supp. 2d 935, 942 (N.D. Cal. 2009) ("Congress . . . is certainly familiar and with the word 'fraud' and choose not to use it; the words 'falsity *or* deception' suggest broader application . . . Congress utilized the word 'fraud' in the very next subsection but not in the savings clause.") (citation omitted); *Asis Internet Servs. v. Subscriberbase Inc.*, No. 09-3503SC, 2010 WL 1267763, at *11 (N.D. Cal. Apr. 1, 2010) ("The explicit language of the preemption clause betrays no intention by Congress to limit state regulation to the simple codification of

PLAINTIFF-INTERVENOR STATE OF
WASHINGTON'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS - 9
(2:25-cv-02388-BJR)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

common law fraud in its purest form.")). This Court should not impose extraneous non-statutory fraud standards here, just as other courts within and outside of Washington.

CEMA's prohibition on false or misleading subject lines, like similar consumer protection statutes, reflects policy decisions about wrongful conduct for which there was no common law tort remedy. A plaintiff need not allege the elements of fraud because the statute has already defined the wrongful behavior. For similar reasons, the Fourth Circuit concluded that neither California nor Maryland's anti-spam statutes were preempted despite neither one requiring pleading or proof of the elements of fraud. *Beyond Sys., Inc. v. Kraft Foods, Inc.*, 777 F.3d 712, 717 (4th Cir. 2015) (citing *Omega*, 469 F.3d 348). Looking at Maryland's statute, the court found that the state appellate court's earlier conclusion that violations of the anti-spam statute, "like violations of the Consumer Protection Act," impose liability for wrongful conduct similar to tort, was sufficient to avoid preemption. *Id.* at 717. Turning to California's statute, the Fourth Circuit likewise noted that (like *Brown*), a state appellate court "limit[ed] the application of California's anti-spam law to deceptive emails" and therefore was not preempted. *Id.* (citing *Hypertouch*, 123 Cal. Rptr. 3d 8 (Cal. App. 2011)). The *Hypertouch* court had already held California's anti-spam law "dispenses with many of the elements associated with common law fraud." *Hypertouch*, 123 Cal. Rptr. 3d. Just as Washington federal courts did in *Harrington*, *Ma*, and *Kempf*, and *Shahpur*, these courts rejected Bebe's proposed rule that the elements of fraud must be pled to avoid preemption. This Court made a similar finding when concluding a plaintiff had Article III standing when making a CEMA claim: "[t]he harms resulting from deceptive commercial e-mails resemble the type of harms remedied by nuisance or fraud actions." *Harbers v. Eddie Bauer*, *LLC*, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019). The Court should likewise reject Bebe's effort here to impose additional pleading requirements on CEMA plaintiffs.

**B.      CEMA Does Not Violate the Dormant Commerce Clause**

Bebe next argues that CEMA violates the dormant Commerce Clause because: (1) CEMA improperly controls conduct occurring wholly outside of Washington; and (2) CEMA

PLAINTIFF-INTERVENOR STATE OF
WASHINGTON'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS - 10
(2:25-cv-02388-BJR)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

imposes disproportionate burdens on interstate commerce. Dkt. 20 at 8-11. These arguments both fail.

Bebe comes to Court with only speculation about CEMA's alleged extraterritorial impact. Such speculative attorney arguments pointedly ignore "the Supreme Court's clear instruction . . . that extreme caution is warranted before a court deploys its implied authority to reject a state law under the dormant Commerce Clause." *Flynt v. Bonta*, 131 F.4th 918, 926 (9th Cir. 2025), *cert. denied,* 25-173, 2026 WL 79841 (U.S. Jan. 12, 2026) (cleaned up). Dkt. 20 at 9 ("Under [Plaintiff's] theory, CEMA would reach an email drafted, transmitted, and read wholly outside Washington solely because the address belongs to a Washington resident."). In support of this argument, Bebe relies upon *Healy v. Beer Institute, Inc.*, 491 U.S. 324 (1989), but reliance upon *Healy* is misplaced for two reasons.

First, Bebe's speculative hypothetical underscores why facial challenges are so disfavored. *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, 450–51 (2008) (facial challenges are disfavored because they "often rest on speculation," "run contrary to the fundamental principle of judicial restraint" and "threaten to short circuit the democratic process").

Bebe's purported concern that a Washington resident may receive an email while temporarily out of state ignores the clear Washington connection required by CEMA—the requirement the email is sent to a Washington resident. *See, e.g.*, *Brown*, 567 P.3d at 45 (CEMA "targets a specific deceptive commercial practice: sending Washington residents commercial e-mails that contain 'false or misleading information in the subject line[s].'") (quoting Wash. Rev. Code § 19.190.020(1)(b)). This scenario does not offend the Constitution, and Bebe's hypothetical cannot change the fact that Wash. Rev. Code § 19.190.020(1)(b) is focused upon activity targeting Washington consumers. Simply put, a company that directs its commercial email to Washington residents does not get a free pass from compliance with Washington law when the resident is temporarily traveling out of state.

PLAINTIFF-INTERVENOR STATE OF
WASHINGTON'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS - 11
(2:25-cv-02388-BJR)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Second, given the unquestionable connection to Washington residents, Bebe's argument goes to CEMA's alleged extraterritorial *impact*, which is an insufficient basis to invalidate a state law under the dormant Commerce Clause. In *National Pork Producers*, the United States Supreme Court unanimously rejected the idea that *Healy* stands for the almost per se rule against extraterritoriality that Bebe advocates for here. 598 U.S. 356, 368 (2023) (plurality opinion). Crucial for the instant motion to dismiss, the Court squarely rejected the argument that *Healy* stands for the *per se* proposition that laws with extraterritorial effects violate the dormant Commerce Clause. Concluding that "petitioners read too much into too little," the Court explained that the challenged statutes in *Healy* and other extraterritoriality cases "had a *specific* impermissible 'extraterritorial effect'—they deliberately 'prevent[ed out-of-state firms] from undertaking competitive pricing' or 'deprive[d] businesses and consumers in other States of 'whatever competitive advantages they may possess.'" *Id.* at 373-374 (quoting *Healy*, 491 U.S. at 338-339).[2] To the extent Bebe relies on other cases from the Ninth Circuit for the purported rule against extraterritoriality—for example, *Sam Francis Foundation v. Christie's, Inc.*, 784 F.3d 1320 (9th Cir. 2015)—those cases were decided prior to *Pork Producers*, have been called into question since *Pork Producers* (*see Flynt*, 131 F.4th at 931-32 (leaving "for another day" the question of whether *Sam Francis* "remains good law" after *Pork Producers*)), and did not involve state law protections for consumers that extended to residents traveling temporarily outside a state's geographic borders.[3]

_____

[2] Although several Justices wrote separately, "the Court unanimously disavow[ed] petitioners' 'almost per se' rule against laws with extraterritorial effects." *Id.* at 389 n.4; *see also id.* at 394 (Roberts, C.J., concurring in part); *id.* at 403, n.1 ("The Court also unanimously rejects plaintiffs' separate claim under *Healy* . . . .") (Kavanaugh, J., concurring in part).

[3] Bebe suggests that the Washington Supreme Court's decision in *State v. Heckel*, 24 P.3d 404 (Wash. 2001) was incorrectly decided because it "relied on an erroneous interpretation and application of dormant commerce clause principles." Dkt. 20 at 10, n.3; Dkt. 27 at 6. However, its argument hinges on the same *Healy* line of cases on extraterritoriality that the U.S. Supreme Court curtailed in *National Pork Producers*.

PLAINTIFF-INTERVENOR STATE OF
WASHINGTON'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS - 12
(2:25-cv-02388-BJR)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

CEMA has a direct connection to Washington, a strong one—it is limited to emails targeting Washington residents, even if some of them temporarily travel outside the state. If there was such a rule as Bebe proposes, it is hard to imagine how the interconnected modern economy would continue to function. *Id.* at 374-75 ("In our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior.").

Bebe's back-up argument—that CEMA violates the dormant Commerce Clause because it imposes undue burdens on interstate commerce—fares no better. This argument fails because it is premised upon the incorrect argument that CAN-SPAM's desire for a more unified national scheme sweeps up CEMA, when Congress in fact expressly saved state statutes like CEMA. If Congress has already carved out space for these state law claims, Bebe cannot use its own disagreement with that policy decision as a basis to invalidate CEMA.

Even assuming Congress does not get the final word when it comes to balancing the implicit interests of state and federal commercial regulation, Bebe's arguments about the supposed burden of complying with CEMA are paper thin. Bebe argues that "any purported local benefit [from CEMA] is extremely limited, if it exists at all" and "the burdens imposed by CEMA on interstate commerce are substantial and excessive," Dkt. 20 at 10, but provides scant analysis in support. The balancing of burdens and local benefits under the dormant Commerce Clause "does not invite courts to second-guess legislatures by estimating the probable costs and benefits of the statute." *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 209 (2d Cir. 2003). Rather, the Court must "presume the law serves the [state's] legitimate interests." *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 452 (9th Cir. 2019). Bebe, as the party challenging CEMA, bears the burden on this issue. *Id.*; *see also Kleenwell Biohazard Waste & Gen. Ecology Consultants, Inc. v. Nelson*, 48 F.3d 391, 399 (9th Cir. 1995) (stating party challenging law must "establish that the burdens that the regulation imposes on interstate commerce clearly outweigh the local benefits arising from it").

PLAINTIFF-INTERVENOR STATE OF
WASHINGTON'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS - 13
(2:25-cv-02388-BJR)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Bebe supports this constitutional argument—one in which the Court must exercise "extreme caution"—by simply stating that "to avoid a potential $500-per-email statutory penalty untethered to injury, nationwide retailers must either build complex state-specific email segmentation systems or conform all subject lines nationwide to Washington's strict subject-line standard." Dkt. 20 at 11; Dkt. 27 at 7 (repeating same). In short, Bebe is arguing that the local benefits identified by the Washington legislature in enacting CEMA are clearly outweighed with the cost of compliance. *Cf.* 1998 Wash. Sess. Laws 517 (former Wash. Rev. Code § 19.190.005) (describing complaints about the growing volume of commercial email); *see also State v. Heckel*, 24 P.3d 404, 409–10 (Wash. 2001) (detailing local benefits from CEMA). This argument fails because "[t]he mere fact that a firm engaged in interstate commerce will face increased costs as a result of complying with state regulation does not, on its own, suffice to establish a substantial burden on interstate commerce." *Ward v. United Airlines, Inc.*, 986 F.3d 1234, 1241–42 (9th Cir. 2021); *see also Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1032 (9th Cir. 2021) ("For dormant Commerce Clause purposes, laws that increase compliance costs, without more, do not constitute a significant burden on interstate commerce."). Moreover, what Bebe calls "Washington's strict subject-line standard" is simply CEMA's prohibition on false or misleading information in the subject line of a commercial email. One way to comply with that standard is to simply stop including false or misleading information in email subject lines—a practice that even Bebe admits is similarly prohibited under federal law. CEMA does not unduly burden interstate commerce.

//

//

//

//

//

//

PLAINTIFF-INTERVENOR STATE OF WASHINGTON'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 14 (2:25-cv-02388-BJR)

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

# IV.    CONCLUSION

The State respectfully requests that the Court deny Bebe's constitutional challenges to CEMA.

DATED this 17th day of March, 2026.

NICHOLAS W. BROWN
Attorney General

*s/ Ben Brysacz*

BEN BRYSACZ, WSBA #54683
ROBERT HYDE, WSBA #33593
CLAIRE MCNAMARA, WSBA #50097
Assistant Attorneys General
Attorneys for Plaintiff-Intervenor State of
Washington
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-474-7744
ben.brysacz@atg.wa.gov
robert.hyde@atg.wa.gov
claire.mcnamara@atg.wa.gov

*I certify that this memorandum does not exceed fifteen (15) pages in compliance with the Court's Standing Order for All Civil Cases (Dkt. 8).*

PLAINTIFF-INTERVENOR STATE OF
WASHINGTON'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS - 15
(2:25-cv-02388-BJR)